McBRIDE, Judge.
This is a workmen’s compensation case wherein plaintiff, an iron construction worker, obtained judgment against defendants (the former employer and his workmen’s liability insurer) in solido for compensation at the maximum rate for a period not to exceed 400 weeks, subject to a credit of $700, representing compensation benefits paid by defendants over a period of 20 weeks. Defendants have appealed.
The only question posed for consideration is whether plaintiff is to be considered totally arid permanently disabled from doing work of any reasonable character. Appellants’ sole contention is that the judgment is erroneous in that plaintiff’s disability has ceased and that it did not extend beyond the 20 weeks for which compensation was paid.
On December 8, 1961, during the scope and course of his employment with defendant Gross on a construction job, plaintiff twisted his back and fell a distance of ten feet to the ground and suffered injuries; he was immediately conveyed to St. Bernard Clinic as an emergency patient and was there examined by Dr. Emile A. Bertucci, a general practitioner of medicine, whose-opinion was plaintiff had sustained injuries, to a<finger, right hand, right knee, and the lower back. At this time it may be said that the injuries other than that to the lower back may be eliminated from consideration and comment as plaintiff seems to have recovered from the effects thereof. Dr. Bertucci diagnosed the back injury as a lumbosacral strain and a possible protruding intervertebral disc which latter condition-was negated by subsequent X-rays. Dr. Bertucci treated plaintiff for the lumbo-sacral strain by administering physiotherapy on twenty-two different dates, lastly on-January 19, 1962. Dr. Bertucci re-examined plaintiff January 2, 1962 (before termination of the treatments), at which time plaintiff experienced severe pain in the lower back. Dr. Bertucci recommended that he attempt light work, but in the meantime instructed him to continue with the physiotherapy.
Plaintiff claims there was no improvement while under Dr. Bertucci’s care, so he requested defendant insurer to furnish him with another physician, and in response to his request was sent to Dr. Irving Redler, orthopedic surgeon, on February 2, 1962, at which time plaintiff complained of pain in the lower part of his back especially when he bent backward. Dr. Redler’s opinion was that the patient had a residual mild lumbosacral strain. In his report of February 6, 1962, Dr. Redler recommended conservative treatment consisting of exercises, application of diathermy, and the infiltration of the tender area in the region of the fifth lumbar spinous process with a local anesthetic solution. Dr. John D. Andrews, an associate of Dr. Redler, administered the recommended treatment, and his report of March 9, 1962, shows that he saw plaintiff on twenty-four occasions; the report describes plaintiff’s injury as “2-L-S strain.’' Dr. Andrews noted in the report that he discharged the patient as cured that day. Plaintiff was again sent to Dr. Redler on November 15, 1963, for re-evaluation and after the same type of clinical examination as before had been conducted, Dr. Redler *466 found no pathology in plaintiff’s back. He stated that plaintiff’s complaint of pain across the low part of his back occurred only in the extremes of extension when he bent backward, but he thought that this was not abnormal or unusual, remarking that any person who bent backward as far as he could was likely to suffer some pain when the limit of extension had been attained. In his final report Dr. Redler commented: “He (plaintiff) is working at present and I see no reason why he cannot continue to work.” However Dr. Red-ler did not then know the exact type of work plaintiff was performing.
On February 28, 1962, of his own accord, plaintiff with complaints of pain in the lower back visited his private physician, Dr. George C. Battalora, Jr., orthopedic surgeon, whose opinion was plaintiff had sustained a lumbosacral sprain. He advised further treatment and the use of a lumbosacral support for a period of six to ten weeks to be followed by postural exercises so as to “gradually taper out of his corset.”
Plaintiff took no treatments from Dr. Battalora, but returned to said physician in April of 1962, stating there was no improvement in his condition. The examination at this time disclosed back motion to be within normal limits but accompanied by pain on extension of the spine. The patient was given abdominal exercises plus diathermy to the back. On May 9, 1962, he told Dr. Battalora his condition had improved to some extent but that he still experienced discomfort in the back upon extension. He was advised to continue with his exercises. Dr. Battalora did not see him again until July 25, 1962, at which time plaintiff stated that in May he had returned to work and was performing light work on the ground which "required no climbing. He still complained of back pains. Dr. Battalora found evidence of spasm in the back musculature, and although flexion was performed within normal limits, there was pain in the back with limited extension , of the spine. On August 27, 1962, approximately a month later, plaintiff was still doing the light work and was making use of his corset most of the time but had pain in the low back. When plaintiff went to Dr. Battalora on October 17, 1962, he stated that the back pain had become more severe after a long motor trip. Dr. Battalora again observed spasm in the back musculature, limited extension, and pain in the lumbosacral area. After making more X-rays, Dr. Battalora discerned mild thinning at the lumbosacral joint and was of the opinion that plaintiff should undergo a lumbosacral fusion, a surgical procedure which was successful only in about eighty per cent of the cases and which would have incapacitated plaintiff for as much as nine months. Plaintiff refused to submit to the operation. Dr. Battalora stated that when he saw plaintiff in November of 1963 (which was one month short of two years from the date of the accident), plaintiff’s back had not improved. He stated:
“His condition remained rather static and during that period of time we had seen him in the office with definite spasm in the back musculature and with limitation and extension and his condition has fluctuated but in general it had remained fairly static.”
When interrogated as to whether plaintiff still suffered from the original complaint sustained in the accident, Dr. Battalora responded by saying that when he last saw plaintiff in November 1963, the complaints were the same.
There was much expert medical testimony pro and con as to what the numerous X-rays showed. Dr. Battalora said that while his first X-rays showed no lumbo-sacral disc pathology, his later pictures of November 1963 disclosed thinning at the lumbosacral disc space and asymmetry of the facets between L-4, L-5 and the sacrum. Dr. Battalora characterized this condition as congenital. He explained that his first X-rays had been made from an improper angle and, hence, possibly caused the different showings between the earlier and the later pictures. But he attributed plaintiff’s *467 present painful condition to the lumbosacral strain:
“ * * * it’s our opinion he has an unstable lumbosacral mechanism and that hard work will produce pain and aggravate the condition and that the solution it would appear to us would be to stabilize that joint with a fusion.”
The learned trial judge asked Dr. Bat-talora:
“Well, assuming that he had no back trouble before and that he did have this accident, could it cause this pain in view of the congenital condition of his spine?”
And the witness replied:
“Yes.”
Drs. Bertucci, Redler and Timothy James Haley (the latter a radiologist who examined all X-rays hut who never saw plaintiff) testified that the X-rays disclosed no such condition as Dr. Battalora stated his interpretation of the later pictures showed. Such divergence in the medical testimony appears immaterial.
This court is not concerned with the exact disorder existing in plaintiff’s anatomy. The thing we shall consider is whether plaintiff was disabled as a result of the injuries he received in the accident of December 8, 1961, when he fell ten feet to the ground.
It is well settled that when a compensation claimant is unable to specifically classify or indicate the type of injury he has sustained does not preclude a recovery of compensation; the test is disability vel non and not the nature of the injury. Jackson v. Bituminous Casualty Corp., La.App., 153 So.2d 585; Johnson v. Atlantic and Gulf Stevedores, Inc., La.App., 102 So.2d 518.
Plaintiff has been an iron worker since 1947; he is 42 years of age; his duties required him to climb metal girders vertically in monkey fashion and connect and bolt beams. Such work continues to the eventual height of the structure. When he climbs a column, more iron is sent to him by a rig and according to plaintiff:
“If you’re sitting on a column ready to connect another piece, iron is coming up, you have to boom out to get it and throw a spud wrench in the hole, you know, holding it to bolt it in to connect the iron.
******
“Q. Does that iron always come in front of your face or does it come in the back of you, at times to the side of you?
“A. You have to do a lot of ducking and guessing and turning to get out of the way sometimes I mean.”
It should be obvious to all that the work required of an iron worker is most strenuous and requires many body movements and extensions.
Plaintiff insists the pain in his back induced by backward extension inhibits him from carrying on those duties. He made an endeavor to return to his former type of work, but was physically unable to carry out his regular and customary duties. Since the accident, whatever duties he has performed have been of lighter character and confined strictly to working on the ground as contradistinguished from working aloft. The bulk of the work he now pursues is welding, and plaintiff states there is a vast difference between the duties of a welder and an able-bodied iron construction worker although the wage scale is the same for both classifications. His condition is such that when he signs in with the union, he places himself in the catagory of welder and not' an iron worker, and because of this, he has been passed up for iron work on construction jobs. He points out very clearly that his inability to perform the full duties of an iron worker lessens his employment opportunities. He claims that before the accident he earned about $7,00Q *468 per annum, but because of the pain in his back and his ability to do lighter work only, his earnings have dropped to less than $3,000 per year.
Dr. Battalora fully supports plaintiff’s claim that he is disabled from performing all of his former duties and must confine his activities to work on the ground. Dr. Battalora agreed with defense counsel that there probably would be times when plaintiff in a general way could do heavy work above the ground, but he felt that his back would prevent him from doing so over a prolonged period of time. He considers plaintiff totally and permanently disabled from carrying on the duties of his occupation of iron worker and attributes this condition to the accident.
Dr. Redler’s opinion on his last examination was that whereas plaintiff was working, he should be able to continue to do so without difficulty or discomfort. However, when plaintiff told Dr. Redler he had been working, he, at that time, was only performing the lighter duties and Dr. Redler frankly admits he was under the impression plaintiff was doing the duties of an iron worker.
This is clearly a case which falls squarely within the manifest error rule. The trial judge saw and heard the plaintiff and the medical experts testify and was able to appraise their demeanor and reactions and weigh their testimony, and it is obvious to anyone reading the record that the judge believed what plaintiff and his medical expert, Dr. Battalora, said. We are now asked by appellants to disregard Dr. Bat-talora’s testimony and to accept instead that of defendants’ medical expert, Dr. Redler. Dr. Andrews did not testify as a witness. Dr. Bertucci, not having seen plaintiff since January 19, 1962, when his last treatment was administered, was not asked, and he did not state, what the plaintiff’s present condition is.
In order for a workman to be classified as totally and permanently disabled, he must he unfit to carry on work of any reasonable character which means, as held by the appellate courts of this state in numerous cases, the duties of the occupation he was pursuing at the time of the accident or duties similar thereto.
It is well settled that the law does not expect, and it does not contemplate, that a workman, in order to make his living, must work in pain or that he do so when it will materially increase not only the hazard to his own health and safety but also to those of his fellow employees. Livaccari v. Fidelity & Casualty Co. of New York, La.App., 118 So.2d 275.
It has also been held that where an injured iron worker, although able to discharge the duties of his occupation only at ground level, where the bulk of his duties entailed work aloft, such workman is totally and permanently disabled within the contemplation of the Workmen’s Compensation Act. Brannon v. Zurich General Accident & Liability Ins. Co., 224 La. 161, 69 So.2d 1; Pohl v. American Bridge Division United States Steel Corporation, La.App., 109 So.2d 823; Livaccari v. Fidelity & Casualty Co. of New York, supra. We think plaintiff can be placed in such category.
Counsel for appellants inform us that a 100-foot roll of 16-millimeter motion picture film was offered in evidence by defendants and exhibited to the trial judge. These were made on December 19, 1963, by two private detectives employed by defendants to keep plaintiff under surveillance in order that defendants might learn the type of work he was engaged in about that time. The pictures were taken with microscopic lenses from a distance of 250-300 feet. The two detectives identified as plaintiff a man shown in the pictures climbing a ladder carrying a large box of tools on his shoulder, and appellants argue the evidence furnished by the pictures would demonstrate beyond doubt that plaintiff can perform off-ground duties. Plaintiff, re *469 •called to the witness stand in rebuttal, testified that the individual pointed out by the detectives as being himself was another ■person with whom he was acquainted. Plaintiff further claims the pictures depict men doing pipefitting work which he had never performed. Plaintiff further declared that on the date the pictures were made his duties required work inside the building being constructed. Not knowing how plaintiff looks, we could not possibly resolve the divergent testimony as to the identity of the man concerned. Undoubtedly the lower court resolved the dispute favorably to plaintiff.
Finding no manifest error in the judgment appealed from, it is therefore affirmed.
Affirmed.