200 So.2d 353 (1967)
Victor D. CARLOCK
v.
Elwood J. GROSS, d/b/a Cotton Construction Company, and United States Casualty Company.
No. 2666.
Court of Appeal of Louisiana, Fourth Circuit.
June 5, 1967.
Rehearing Denied July 5, 1967.
*354 D. A. McGovern, III, and Richard A. Najolia, New Orleans, for plaintiff-appellee.
Wicker, Wiedemann & Fransen, Thomas C. Wicker, Jr., Lawrence D. Wiedemann, A. Remy Fransen, Jr., New Orleans, for defendants-appellants.
Before YARRUT, SAMUEL and BARNETTE, JJ.
BARNETTE, Judge.
This is an appeal by the defendants in a workmen's compensation case from a judgment refusing to grant a modification of the judgment awarding compensation to plaintiff in the amount of $35 per week, not to exceed 400 weeks. The defendants contend that the plaintiff is no longer disabled or under any physical incapacity which prevents him from pursuing his former employment as an ironworker.
The present action is a sequel to an earlier appeal in the same suit. Carlock v. Gross, 167 So.2d 464 (La.App.1964). Our judgment on the earlier appeal affirmed the lower court's holding that the plaintiff suffered total and permanent disability from his injury.
The modification proceedings were instituted under the provisions of LSA-R.S. 23:1331, which provides in part:
"At any time six months after the rendition of a judgment of compensation, a judge of the trial court that rendered the judgment shall review the same upon the application of either party for a modification thereof, on the grounds that the incapacity of the employee has been subsequently diminished or increased * * *"
A defendant-employer or insurer instituting such modification proceedings has the burden of proving that the employee's disability has diminished or ceased, and that the employee is no longer disabled from performing his occupational duties by reason of a work-caused injury. Belsome v. Southern Stevedoring, Inc., 239 La. 413, 118 So.2d 458 (1960); Cloud v. National Sur. Corp., 166 So.2d 31 (La.App. 3d Cir. 1964); *355 Holmes v. New Amsterdam Cas. Co., 128 So.2d 269 (La.App. 1st Cir. 1961).
The defendants requested that the court appoint an independent medical expert to examine the plaintiff and to report to the court as provided in LSA-R.S. 23:1123. The pertinent provisions of that statute are:
"If there be any dispute thereafter as to the condition of the employee, the court, upon application of either party, shall order an examination of the employee to be made by a medical practitioner appointed by the court. * * * The medical examiner shall report his conclusions from the examination to the court, and such report shall be prima facie evidence of the facts therein stated in any subsequent proceedings under this Chapter."
This request was granted and the plaintiff was subsequently examined by the court-appointed medical expert, Dr. Robert M. Rose, an orthopedic surgeon.
We are of the opinion that the jurisprudence restricted the trial below to one issue, to wit, whether the plaintiff is now able to perform substantially the same duties of employment as performed by him prior to the accident. Bonin v. Sam Carline, Inc., 117 So.2d 312 (La.App. 1st Cir. 1959); Thompson v. Bituminous Cas. Corp., 104 So.2d 248 (La.App. 2d Cir. 1958); Nubles v. Texas Gas Transmission Corp., 72 So.2d 565 (La.App. 2d Cir. 1954); Strother v. Standard Acc. Ins. Co., 63 So.2d 484 (La. App. 1st Cir. 1953).
The fact that he is presently employed as a welder in electrical construction at wages exceeding those which he received from his employment prior to the accident, is not alone sufficient to preclude his right to continue to receive compensation payments. Myers v. Jahncke Service, 76 So.2d 436 (La.App. Orleans 1954); Strother v. Standard Acc. Ins. Co., supra; Cobb v. A. G. McKee & Co., 45 So.2d 432 (La.App. 1st Cir. 1950); De Kerlegand v. Car & General Ins. Corp., 30 So.2d 881 (La.App. Orleans 1947).
In our opinion on the first appeal we followed our jurisprudence interpreting "work of a reasonable character" and said:
"In order for a workman to be classified as totally and permanently disabled, he must be unfit to carry on work of any reasonable character which means, as held by the appellate courts of this state in numerous cases, the duties of the occupation he was pursuing at the time of the accident or duties similar thereto." 167 So.2d at 468.
In wrestling with the vexing issue of "work of a reasonable character" in regard to skilled workmen versus common laborers, a jurisprudential rule has evolved: in the case of the "skilled" workman the test of ability to perform the same or "similar" duties is more rigidly applied and the limits of dissimilarity of duties become more narrow as the extent of skill is increased.[1]
There is no question that Mr. Carlock, being employed at the time of injury as an off ground ironworker, was engaged in a work requiring a high degree of skill. Nor is there any question that his present employment as an electrician's welder is one requiring a high degree of skill. The duties are not the same, though in some respects similar. It is our opinion that his demonstrated ability to perform the duties of the latter falls short of meeting the jurisprudential rule of same or similar work. However, the fact that he remains in the work of electrician's welder, rather than return to ironwork, is not necessarily evidence of his inability to return to his former employment. It could well be a matter of choice; a choice conceivably influenced by the prospect of losing $35 per week in supplemental income. A workman *356 might prefer not to return to his former work for a number of considerations: security, regularity of employment, environment, etc. Therefore, the question we must determine is not whether his present employment is the same or similar, or more or less remunerative than the former, but whether he continues to be physically incapacitated from performing the duties of the former.
Plaintiff's duties as an ironworker were discussed by us in our opinion on the first appeal, 167 So.2d at 467, and will not be repeated here. Evidence of his ability to do the things required of his present employment will be considered in connection with the testimony of the examining physicians for such corroborative support as it might give to their expert opinions of his present physical limitations.
Plaintiff freely admits his present employment has extended without interruption over a period of many months. He admitted also that it requires climbing on scaffolds and the handling of heavy objects. However, he stated that he does not climb to the heights required of an ironworker, nor does he handle very heavy objects on narrow platforms or beams which would require a great amount of strength and balance. By the use of motion pictures Carlock was shown climbing upon a scaffold by means of a ladder and handling certain objects. He appeared to be laying boards for decking on a scaffold and handling a sheet of plywood. He also appeared to be working with aluminum tubing to be used as electrical conduits. It is in this particular respect that he does welding. The photographers admittedly took pictures showing him in the most strenuous activity observed by them during the three days he was under surveillance. The pictures, exhibited before us, indicated that he performed these duties in a very normal manner and without difficulty.
The medical testimony reviewed by us in considerable detail in our first opinion will not be repeated here. Our consideration of the issue presently before us is limited to the medical testimony taken on trial of the application for modification.
The court-appointed medical expert, Dr. Rose, testified that Mr. Carlock related his case history to him. Dr. Rose stated that the plaintiff complained of back trouble, "consisting of continuous pain in what he indicated as the right lumbosacral area of his back and this pain radiated down the back of his leg to the knee." Bending tests were normal with no limitations nor muscle spasm, but he did complain of a "catch in his back on bending backwards." Straight leg raising test, to 90 with each leg, was without complaint. Reflexes were normal.
An X ray was made upon his direction by Dr. Robin Hardy with the following report:
"Lumbosacral spine, all of the visualized bones appear normally mineralized and intact with their being no fracture or destructive process recognized involving them.
"The pedicles are not unusual. A small osteophyte arises at the anteriosuperior aspect of the fourth body. There is no evidence of spondylolisthesis or spondylolisis [sic]. The heights of the disc spaces are within the range of normal variation.
"The zygapophyseal, sacroiliac and hip joints are clear. The sacral foramen are sharply demarcated and no evidence of osseous disease or injury is identified within the bones of the pelvis.
"Conclusions: Aside from one osteophyte, the osseous elements in this region are normal and geographical."
Dr. Rose concurred in the findings of Dr. Hardy.
Mr. Carlock's right leg is a bit shorter than the left, but not from any cause associated with the accident. Dr. Rose said of this condition:
"A It's just the way nature made him. He happened to grow that way.

*357 "Q It's a developmental thing?
"A Yes.
"Q He was born with this kind of leg?
"A Or else he just grew that way, yes."
He further testified:
"Q Now, Doctor, you said that the man had a slight pelvic tilt?
"A That's due to the shortened right leg.
"Q I see. This information, in your opinion, this would not be related to trauma?
"A No, sir.
"Q I see. Now, Doctor, in your expert opinion, from your examination of this individual and from the x-rays that we have available, would you feel that as a result of the back that you see there and that you examined, that this man would have any disability or inability to perform the usual functions of an iron worker, that would be climbing and lifting and that sort of thing, heavy, manual labor?
"A Not from either the physical examination or the x-ray examination.
"Q Doctor, from the shortening of the leg, you said there might be some pain concurrent with this condition, which is a developmental condition, could this condition conceivably give a man pain while engaged in heavy, manual labor?
"A People with a short leg tend to get recurrent back bouts of discomfort and backache.
"Q Now, in the historygo ahead.
"A Sometimes they are relieved by heel elevation, sometimes not. These attacks don't usually disable them, it's just discomfort which they experience.
* * * * * *
"A I found no evidence of a painful condition existing, because there was no limitation of motion, the complaint was only discomfort on bending backward, there was no muscle spasm.
"Q No objective indication?
"A No; that's right."
Concerning the osteophyte mentioned in the X ray report, he testified:
"A Well, the only thing that shows on the x-rays is the osteophyte on the body of the third lumbar vertebra and usually an osteophyte on the vertebra is produced by the stripping of anterior longitudinal ligaments, whether this came on after his injury or predated, I can't tell from the one set of x-rays, this could only be settled by also checking x-rays that were made on him at an earlier time, closer to the time of injury."
After checking the X ray taken two months after the accident which showed the osteophyte, he said it predated the accident, since it takes at least nine months for osteophytes to develop after an injury. He also stated that osteophytes are not necessarily disabling and that there were no abnormalities apparent on the X ray other than the osteophyte. Dr. Rose exhibited a very good knowledge of the duties of an ironworker and expressed the opinion that Mr. Carlock was physically able to perform such duties.
On cross-examination he was asked in the light of plaintiff having worked as an ironworker for 14 years without discomfort, then had a trauma and could not return to that work without a great deal of discomfort, would that relate to the shortness of the leg or to the trauma. He answered:
"Well, the point is, this man had his trauma five years or more ago and whatever he injured at that time certainly had ample time to heal. The human body does have a healing mechanism within it.

*358 "Now, he comes in my office at this time complaining of discomfort and leg pain and I examined him and his complaints and the findings are in line with the short leg, in other words, if I had no past history on the man at all, my conclusion would be that his back trouble is secondary to the way nature made him.
"If you add on to this, he had an injury five years ago and suffered since then, my answer would be I don't think it has anything to do with his present status."
In rebuttal of this medical testimony is that of Dr. George C. Battalora, Jr., a physician of equally fine qualifications. Dr. Battalora was Mr. Carlock's personal physician and testified at the first trial. He had not seen him for three years preceding his examination a few days before the trial of the present issue. He testified:
"Q Well, Doctor, would you just give us your general opinion as to Mr. Carlock's well-being right now as pertaining to his injury?
"A Well, my opinion, as stated in this report rendered upon my examination of 11/9/66, is based on the fact that I've seen him on numerous occasions since the early part of 1962, I've seen him when he has presented with spasm in the back musculature on numerous occasions and I have seen him, repeated x-rays of his back which, in my opinion, showed demonstrable structure changes at the lumbosacral joint.
"The type of complaints he has presented to me over these numerous office visits are the typical complaints of a man suffering from an unstable back.
"It is our opinion this man has an unstable lumbosacral joint. He apparently has done fairly well in the last three years at lighter type work. We cannot deny he has periodic back pain, however, since he could work consistently the past three years, it does not seem a lumbosacral fusion is indicated.
"He's apparently able to get by without undue back discomfort, although the indications are normal at this time, the complaints are the type of an individual suffering with a weak joint. He has structural pathology in the x-rays at the lumbosacral joint.
"I, therefore, would estimate a permanent impairment of the spine in the neighborhood of 5 to 10 per cent of the spine.
* * * * * *
"Q Now, Doctor, if I were to send Mr. Carlock to you and you knew nothing of his past history and asked you to examine Mr. Carlock and then I were to tell you that five years prior to this examination he sustained a trauma, would this information mean anything to you?
"A Well, as I stated in my last report which we just went over, I felt that he presented with normal back motion at that time and my opinion was based on the fact that I had seen him since shortly after his injury in `61 on numerous occasions, where he did present evidence of impairment in his spine.
"If I had seen him for the first time on November 9, 1966, I probably would have not rendered any disability to the spine.
* * * * * *
"Q Do you think he would be able to do this type of work?
"A It is possible that he could perform his previous type of work. I do not feel, however, that he could do it on a consistent basis without difficulties."
On cross-examination Dr. Battalora said he had recommended a spinal fusion prior *359 to the first trial, which he now admits plaintiff does not need. He also recommended that Carlock wear an elevated shoe heel for his short leg condition and a corset to support his back.
The two doctors were not entirely in agreement in their reading of the X ray plates on the matter of intervertebral spacing, but Dr. Battalora did say he could see no difference in the X rays made upon his direction and those made for Dr. Rose. The difference therefore was one of professional interpretation.
Dr. Battalora further testified:
"BY THE COURT:
"One question, Doctor.
"Q You talked about a degenerative condition?
"A Yes, sir.
"Q This, of course, this accident in this case goes over a period of some five years, would a person's normal increase in age have anything to do with the degenerative condition?
"A Well, actually the thing which I feel is present that the lumbrosacral disc space, has been present from the early part of our treatment and I haven't seen any progression in the thing.
"Now, this man has had some paranesthesia type pains in his right lower extremity. On two or three occasions during my examination of this man, he has had a hyperactive right ankle jerk, which, in my opinion, would coincide with a degenerative disc situation at the lumbosacral joint.
"He never has had the real acute disc symptoms, but I feel that he does have trouble at his lumbosacral joint."
and finally:
"Q One question. One question, and finding no spasm, Doctor, would this negate the possibility this man was still suffering from this truma?
"A No. He is well past any acute phase of this thing. He's in the chronic stage and these people usually have exascerbation [sic] and remissions and it may be you could examine him on one occasion and even now find spasm, whereas two or three days later you may not. I do not feel that the fact he's having severe pain in his back at all times, but there could be times when he would have severe pain."
The fact that the statute gives the force of prima facie presumption of correctness to the court-appointed expert's findings is indicative of legislative intent that this testimony carries a significant weight. An added measure of probative value is clearly implied by the statute in our opinion. It appears that the court in Dees v. Louisiana Oil Refining Corp., 162 So. 597 (La.App.2d Cir. 1935), was of the same opinion. There it upheld the trial judge who apparently applied this rationale. We think the reason for this is obvious. The court-appointed medical expert is a wholly disinterested party, and it is more likely that his examination will be entirely objective. He has given no previous report or testimony which he might be inclined, though honestly, to vindicate. One who accepts the responsibility of performing a professional service which calls for the expression of an expert opinion is more likely to be sympathetic toward the interest of his client or patient. This is a factor to be considered, especially when the issue is a close one.
This prima facie presumption should not require a greater amount of evidence to refute than any other prima facie presumption, but a mere contrary opinion is not alone sufficient to overturn it. To hold otherwise would render LSA-R.S. 23:-1123 meaningless.
*360 The burden of proof which defendants carry in a case of this kind does not require more than a preponderance of the evidence. It may be assumed in every case there will be some testimony to contradict the court-appointed medical examiner.
It has been said:
"The divergence of opinion among the doctors in this case, as in all others of a like kind, is regrettable, but in cases of this kind, if compensation were not allowed because of the conflicting opinions of the doctors, there would never be a case in which a compensation claimant could or would be awarded compensation." Nash v. Solvay Process Co., 189 So. 493 (La.App.2d Cir.1939) at 508.[2]
The same may be said of the discontinuance or modification of the award.
If mere contradiction is construed as rebuttal sufficient to overcome a prima facie presumption, then the relief provided the employer by LSA-R.S. 23:1331 is more fanciful than real. If this promised relief were denied defendants in this case, it would be difficult to conceive of a case in which it could be granted and the legislative intent would be defeated. We therefore hold that defendants have discharged the burden of proof required by law by a preponderance of the evidence.
The judgment appealed from, insofar as it dismisses defendants' petition for modification of the judgment of January 29, 1964, is reversed. Judgment is now rendered in favor of defendants Elwood J. Gross, doing business as Cotton Construction Company, and United States Casualty Company against the plaintiff Victor D. Carlock. We decree that the compensation benefits heretofore paid to plaintiff pursuant to the judgment herein of January 29, 1964, as affirmed by this court in Carlock v. Gross, supra, are in full satisfaction of all claims resulting from the injury sustained by him in the course of his employment, December 8, 1961. Defendants are discharged from further payments and plaintiff's compensation is terminated.
Plaintiff-appellee is cast for costs of this proceeding in both courts.
Reversed and judgment rendered.
NOTES
[1] Malone, Louisiana Workmen's Compensation, Law and Practice § 275.
[2] Ibid., §286, n. 6.